UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

In re

                                           Chapter 11

THE BROWN PUBLISHING COMPANY, DPI
LIQUIDATION INC., BROWN MEDIA HOLDINGS
COMPANY, BOULDER BUSINESS INFORMATION
INC., BROWN BUSINESS LEDGER, LLC, BROWN          Case No.: 10-73295 (DTE)
PUBLISHING INC., LLC, BUSINESS PUBLICATIONS,
LLC, THE DELAWARE GAZETTE COMPANY, SC BIZ      (Jointly Administered)
NEWS, LLC, TEXAS COMMUNITY NEWSPAPERS,
INC., TEXAS BUSINESS NEWS, LLC, TROY DAILY
NEWS, INC., UPSTATE BUSINESS NEWS, LLC,
UTAH BUSINESS PUBLISHERS, LLC, ARG, LLC,

                            Debtors.

---------------------------------------------------------------------------x

THE BROWN PUBLISHING COMPANY LIQUIDATING
TRUST,

                          Plaintiff,

        -against-                                Adv. Pro. No.: 12-08193

ROY E. BROWN, CLARENCE J. BROWN III, CLARENCE
BROWN, JR., JOYCE E. BROWN, DOROTHY HAINES,
RICHARD HAINES, CATHERINE BROWN BRINNON,
CRJ INVESTMENTS LLC, AEG EQUITY HOLDINGS,
LTD., SODALIS, L.L.C. and B'S NEST PARTNERSHIP,

                            Defendants.

---------------------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER

*Appearances:*

Westerman Ball Ederer Miller & Sharfstein, LLP
*Attorneys for Defendant Catherine Brown Brinnon*
By: Thomas A. Draghi, Esq.
1201 RXR Plaza
Uniondale, New York 11556

Frost Brown Todd LLC
*Attorneys for Defendant Catherine Brown Brinnon*
By: James C. Frooman, Esq.
301 East Fourth Street
Cincinnati, Ohio 45202

McLaughlin & Stern LLP
*Attorneys for Plaintiff*
By: Lee S. Shalov, Esq.
Wade C. Wilkinson, Esq.
260 Madison Avenue
New York, New York 10016

HONORABLE DOROTHY T. EISENBERG, U.S. BANKRUPTCY JUDGE

Before the Court is the motion for summary judgment by Defendant Catherine Brown Brinnon, hereinafter the Defendant or Brinnon, seeking to dismiss counts VI through IX and counts XXI through XXIV alleged against her in the Plaintiff's Amended Complaint (the "Summary Judgment Motion"). At the hearing on the Summary Judgment Motion held on February 27, 2014 (the "Hearing"), the Plaintiff agreed to the dismissal of counts XXI through XXIV against the Defendant concerning certain payments made by the Debtor to AXA Equitable Life Insurance Company. What remains is whether Defendant's Summary Judgment Motion seeking the dismissal of counts VI through IX which seek to avoid certain transfers made by the Debtor to the Defendant as fraudulent conveyances, should be granted. This Court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (H), and (O), 11 U.S.C. §§ 544(b) and 550(a)(1) and (2), Ohio Rev. Code Ann. §§1336.04(A)(1) and (2), and unjust enrichment. The following constitutes the Court's finding of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## FACTS

The Defendant is the sister of Roy Brown and Clarence J. Brown III ("Clancy Brown"). Up until November 17, 1999, she was an employee of The Brown Publishing Company, an Ohio corporation and a debtor in this bankruptcy proceeding, hereinafter the Debtor or BPC. She and her brothers each owned a 33.3% partnership interest in The B's Nest, an Ohio partnership and non-debtor affiliate of BPC. The B's Nest held the common stock of BPC. Roy Brown was the president of the Debtor from at least 2006 until the Debtor's bankruptcy filing on April 30, 2010. Clancy Brown was a member of the board of directors of BPC and eventually became the chairman of the board.

1

Pursuant to the Partnership Withdrawal and Amendment to Partnership Agreement of The B's Nest (the "Partnership Withdrawal Agreement") and a stock redemption agreement dated, November 17, 1999 ("Stock Redemption Agreement"), Defendant resigned from her position at BPC and withdrew from The B's Nest. In liquidating her partnership interest, The B's Nest gave Defendant 6,478 shares of BPC which BPC redeemed. Although no formal valuation of the BPC shares was conducted at the time, the shares were deemed to have a value of $9,380,647.40. The redemption amount provided to the Defendant was in the form of a promissory note payable over 12 years at 5.62% interest, and in quarterly payments of $270,000 (the "Promissory Note"). The Promissory Note was guaranteed by The B's Nest pursuant to a nonrecourse guarantee which was secured by 100% of the shares in BPC held by The B's Nest.

On January 31, 2001, Sodalis, LLC, another non-debtor entity related to the Debtor, assumed the Debtor's obligations under the Stock Redemption Agreement and the Promissory Note pursuant to a Novation Agreement (the "Novation Agreement"). The purpose of having Sodalis assume the obligation of the Debtor was to get the Debtor's obligation to the Defendant off its balance sheets in order to obtain third party financing. Sodalis did not have the funds to assume the Debtor's obligation as it mainly held real property secured by mortgages. In order to accomplish this, Sodalis was given 3,864.95 of Class B Preferred Shares of BPC (the "Class B Preferred Shares") in exchange for the assumption of the Debtor's liability to the Defendant. Each Class B Preferred Share has a par value of $1,500 and the aggregate value of the approximately 3,865 Class B Preferred Shares was $5,797,500. It was intended that the Debtor would make distributions of dividends on and/or redemptions of the Class B Preferred Shares to Sodalis which in turn would pay the Defendant pursuant to the Novation Agreement.

2

At the time of the Novation Agreement, the Debtor had already paid $781,337.53 to the Defendant under the Promissory Note and had agreed to prepay another $2,842,154 which represented payments due her up to July 1, 2005. Accordingly, $5,757,155.87 remained outstanding under the Promissory Note. Sodalis would not need to commence payment to her until July 1, 2005. The Novation Agreement remained secured by the nonrecourse guarantee provided by The B's Nest and by a first priority security interest in the Class B Preferred Shares held by Sodalis. On January 4, 2008, Sodalis and the Defendant amended the Novation Agreement to provide that Sodalis shall deliver to the Defendant $800,000 on January 4, 2008 and the Defendant shall receive quarterly principal and interest payments in the amount of $250,000 commencing on July 1, 2008.

Notwithstanding Sodalis' assumption of the Debtor's obligation to Defendant, the Debtor made the following payments to the Defendant (the "Brinnon Transfers"):

| | |
|---|---|
| September 5, 2006 | $1,000,000 |
| September 12, 2006 | $ 500,000 |
| June 11, 2007 | $ 20,000 |
| January 4, 2008 | $ 800,000 |
| July 8, 2008 | $ 20,000 |
| July 25, 2008 | $ 125,000 |
| Total | $2,465,000 |

The Brinnon Transfers were made within four years of the chapter 11 filing of the Debtor and fourteen other related entities on April 30, 2010. The bankruptcy cases were complex and involved heavily contested motion practice. A chapter 11 plan was confirmed on June 15, 2011. Pursuant to the chapter 11 plan, the Plaintiff, The Brown Publishing Company Liquidating Trust, was created with the purpose of pursuing certain causes of actions for the benefit of creditors. Thomas C. Carlson was appointed to serve as the Liquidating Trustee and the Debtor's counsel,

K&L Gates, LLP served as counsel to the Trustee. The Plaintiff has filed more than fifty adversary proceedings against various defendants.

The Plaintiff commenced this adversary proceeding on April 30, 2012 against not only the Defendant but also eleven other individuals and entities who are either insiders of the Debtor or entities in which such insiders have an interest. The Amended Complaint contains twenty-six causes of action against the various defendants seeking to avoid numerous alleged fraudulent transfers and preferences with respect to various unrelated transactions. With respect to this Defendant, the Plaintiff seeks, *inter alia,* to avoid the Brinnon Transfers as fraudulent conveyances. Defendant filed an answer on June 20, 2012. On April 10, 2013, Defendant filed this Summary Judgment Motion.

The hearing on the Defendant's Summary Judgment did not take place until February of 2014 primarily because in March of 2012, Roy Brown filed two motions seeking the removal of K&L Gates as counsel to the Trustee. Subsequently, the attorney at K&L Gates who was the primary counsel representing the Debtor and then the Plaintiff left K&L Gates and other attorneys at K&L Gates had to familiarize themselves with the history of the Debtor and the bankruptcy file. After several protracted evidentiary hearings, the Court issued a Memorandum Decision on April 29, 2013 finding K&L Gates failed to adequately inform the Court of its prior relations with various creditors and parties in interest. Pending a determination of sanctions, Carlson stepped down as Trustee of the Plaintiff. Pursuant to an Order dated August 5, 2013, Barry R. Carus was appointed as successor Trustee. Pursuant to an Order dated September 19, 2013, McLauglin & Stern was retained as counsel to the successor Trustee. The deadline for completion of fact discovery was January 31, 2014 and the deadline for expert discovery has

4

been extended to April 30, 2014.

DISCUSSION

I.    *Summary Judgment Standard.*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by

Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. The movant always

bears the initial burden of showing there is an absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). The

moving party is not required to support its motion with affidavits or similar evidence that would

negate the nonmoving party's claim. *Id.*, 477 U.S. at 323-24. Any inferences from the underlying

facts must be resolved in favor of the non-moving party. *Rieser v. Hayslip (In re Canyon Systems

Corp.)*, 343 B.R. 615, 628 (Bankr. S.D. Ohio 2006).

Once the moving party satisfies its initial burden, the nonmoving party with the burden of

proof is required to present evidence permitted by Rule 56(c), other than mere pleadings, to

show there are genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323-24. When

adequate time for discovery has taken place, if the nonmoving party with the burden of proof at

trial fails to make a sufficient showing of evidence on an essential element to that party's case,

then Rule 56(c) generally mandates the entry of summary judgment against such party. *Id.,* 477

U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a

complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.*, 477 U.S. at 322-23. In such instance, the

standard for summary judgment is essentially similar to that for a directed verdict under Rule

50(a), which requires the trial judge to "direct a verdict if, under the governing law, there can be

but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> The mere existence of a scintilla of evidence in support of the
> plaintiff's position will be insufficient; there must be evidence on
> which the jury could reasonably find for the plaintiff.

*Id.*, 477 U.S. at 252. However, the opposing party may not rely upon "mere speculation or

conjecture as to the true nature of the facts to overcome a motion for summary judgment."

*Knight v. U.S. Fire Ins. Co.,* 804 F.2d 12 (2d Cir. 1986). In this instance, Plaintiff as the

nonmoving party, must make a sufficient showing of evidence on its fraudulent transfer claims

with respect to each essential element of its causes of action against the Defendant.

II.    *Fraudulent Transfer Claims.*

Under section 550(a) of the Bankruptcy Code,

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided
under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for
the benefit of the estate, the property transferred, or if the court so orders, the value of such
property, from —
> (1) the initial transferee of such transfer or the entity for whose benefit
> such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Section 544(b)(1) in turn provides for the avoidance of "any transfer of an interest of the

debtor in property or any obligation incurred by the debtor that is voidable under applicable law

by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). The applicable state law

in this case is the Ohio Uniform Fraudulent Transfer Act.

A.    *Count VI - Intentional Fraudulent Transfers.*

Both 11 U.S.C. § 548(a)(1)(A) and Ohio law permit the avoidance of a transfer made with the actual intent to defraud creditors. Section 548(a)(1)(A) of the Bankruptcy Code applies to transfers that were made on or within two years of the petition date whereas Ohio law provides that a transfer is fraudulent as to a creditor whose claim either arose before or within four years after the transfer, if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Ohio Rev. Code Ann. § 1336.04(A)(1)(LexisNexis 2013).

Plaintiff is required to establish the intent to hinder, delay or defraud creditors by clear and convincing evidence. *In re Canyon Systems Corp.*, 343 B.R. at 635. As direct evidence of a debtor's actual intent to defraud is difficult to establish, courts have considered certain factors or "badges of fraud" set forth under Ohio Rev. Code Ann. § 1336.04(B) to determine whether actual intent to defraud exists. *UAP-Colombus JV326132 v. Young*, No. 09AP-646, 2010 WL 532443, *9 (Ohio Ct. App. Feb. 16, 2010). Such badges of fraud include, but are not limited to:

(1) Whether the transfer or obligation was to an insider;
(2) Whether the debtor retained possession or control of the property transferred after the transfer;
(3) Whether the transfer or obligation was disclosed or concealed;
(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
(5) Whether the transfer was of substantially all of the assets of the debtor;
(6) Whether the debtor absconded;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor as reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; [and]

7

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Ohio Rev. Code Ann. § 1336.04(B). Ohio courts require at least three badges of fraud for there to be a sufficient showing of actual fraudulent intent before the burden of proof would shift to the defendant. *UAP-Colombus JV326132*, 2010 WL 532443 at *9. If the burden shifts to the defendant, then the defendant must prove that the transfers were not fraudulent by demonstrating good faith and that it paid reasonably equivalent value. *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App. 3d 644, 650-51 (Ohio Ct. App. 1993).

For purposes of this Summary Judgment Motion only, the Defendant concedes that she is an insider of the Debtor as she is a relative of a director, officer or person in control of the Debtor. Ohio Rev. Code Ann. § 1336.01(G). Aside from the fact that Defendant is an insider of the Debtor, Plaintiff argues that the following additional badges of fraud also exist: (a) the Brinnon Transfers made upon Defendant's threat of litigation for nonpayment under the Novation Agreement; (b) the Debtor concealed the Brinnon Transfers; (c) the Debtor did not receive reasonably equivalent value for the Brinnon Transfers; and (d) the Brinnon Transfers were made when the Debtor was insolvent or became insolvent shortly thereafter.

### 1. Whether There Was A Threat of Litigation.

Plaintiff argues that the Debtor made three Brinnon Transfers in 2008 totaling $945,000 under a threat of a lawsuit conveyed in a December 5, 2007 email by Defendant's counsel to Joel Dempsey, the Debtor's in-house counsel and an investor in Sodalis. Defendant and her counsel made repeated inquiries and demands for payments and Plaintiff asserts that the December 5, 2007 email clearly indicates that if the Defendant were "to continue to forbear from pursuing collection" then the Defendant's counsel needed to receive a "firm payment schedule

8

immediately." Pl. Opp'n. Summ. J., Ex. 12. Plaintiff argues that any threat of litigation against Sodalis, the actual obligor under the Novation Agreement, constituted a threat against the Debtor as Roy Brown was a member of Sodalis and an officer of the Debtor and a threat to Sodalis would have been a threat to Roy Brown's "enterprise structure."

The email was dated December 5, 2007, so this badge of fraud alone would not apply to any of the Brinnon Transfers which occurred prior to 2008. However, while the demand for a firm payment schedule is not a demand for immediate payment, it was nevertheless a demand made with a threat of a collection action if such demand was not satisfied. Moreover, the demand was made by counsel as opposed to the Defendant which indicates that the Defendant was ready to engage in litigation given the constant delay in her receipt of payments. Accordingly, the Court finds that there was a pending threat of litigation by the Defendant.

Whether Roy Brown or Joel Dempsey took the threat seriously is disputed and raises an issue of material fact as to whether such litigation threat precipitated the Brinnon Transfers in 2008. Any litigation could only have been brought against Sodalis which did not have any independent means to satisfy its obligation under the Novation Agreement without the Debtor's financial assistance. While there has not been a sufficient showing as to whether Sodalis was vital to Roy Brown's "enterprise structure", and whether Roy Brown considered the litigation threat against Sodalis to be a threat to his "enterprise structure", it is apparent that Roy Brown and Dempsey took the view that the Debtor was obligated to make the distribution payments in order to allow Sodalis to satisfy its liability under the Novation Agreement. Pl. Opp'n. Summ. J., Ex. 12. Accordingly, Plaintiff has shown that there was a threat of litigation but there is an issue of fact as to whether the Debtor made the Brinnon Transfers in 2008 as a result of this threat.

9

### 2. Whether The Brinnon Transfers Were Concealed.

Plaintiff argues that Roy Brown never discussed the Debtor's payment of Sodalis' debt with other officers or directors of the Debtor based upon his December 9, 2013 deposition testimony ("Roy Brown Dep.") on the basis that he did not think those payments would rise to a level of discussion with Joel Dempsey or Joseph Ellingham, the Debtor's chief financial officer. Roy Brown Dep. 76:8-16, Dec. 9, 2013. Given that some of the officers and directors of the Debtor were also members of Sodalis, it is clear that certain insiders knew about the Debtor being the source of the Brinnon Transfers. Clancy Brown, a member of the Debtor's board of directors, should have known about the Brinnon Transfers as he was also a member of Sodalis. Dempsey knew that the Debtor was the ultimate source of the Brinnon Transfers because he later became a member of Sodalis and he signed the amendment to the Novation Agreement on behalf of Sodalis. Furthermore, based upon email correspondence by him to Roy Brown and Defendant's counsel in 2007 and 2008, Dempsey knew that the Defendant would be paid after the Debtor closed on its sale of certain of its newspapers. Accordingly, Dempsey was aware that the Debtor was the source of the payments to the Defendant.

While certain officers and directors of the Debtor were aware of the Debtor's payment of distributions on the Class B Preferred Shares, the Court does not have any information as to whether the Brinnon Transfers were authorized by the Debtor's board of directors or its lenders and whether the board of directors and the lenders were aware distributions were being made directly to the Defendant with respect to the Class B Preferred Shares. No minutes relating to board meetings have been presented showing that the Debtor's payments to the Defendant on behalf of Sodalis were discussed or approved. Accordingly, the Court finds there to be issues of

fact regarding whether the Debtor concealed the Brinnon Transfers.

### 3. Whether There Was Reasonably Equivalent Value.

In determining whether there was reasonably equivalent value, courts compare the value of the property transferred with the value of the property received. *In re Canyon Systems Corp.*, 343 B.R. at 639; *Dayton Title Agency, Inc. v. The White Family Companies, Inc. (In re Dayton Title Agency, Inc.)*, 292 B.R. 857, 874 (Bankr. S.D. Ohio 2003). "The date for determining reasonably equivalence is the date of the transfer." *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 342 (6th Cir. 2006). The value of the property received is determined from the debtor's standpoint. *In re Canyon Systems Corp.*, 343 B.R. at 639. What constitutes reasonably equivalent value depends upon the facts and circumstances and can be in the form of either direct or indirect economic benefit. *In re Wilkinson*, 196 F. App'x at 341-42. The value of any indirect economic benefit must be concrete and quantifiable to be considered. *In re Dayton Title Agency, Inc.*, 292 B.R. at 875. Under certain circumstances, the satisfaction of an antecedent debt can establish value. *In re Wilkinson*, 196 F. App'x at 343. A transfer to a third party generally does not constitute reasonably equivalent value. *Jobin v. The Resolution Trust Corp.*, 160 B.R. 161, 169 (D. Colo. 1993). However, a transfer to a third party that would provide a dollar-for-dollar reduction of a debtor's debt to an obligee who is in turn obligated to such third party may constitute reasonable equivalent value. *Southeast Waffles, LLC v. United States Department of Treasury (In re Southeast Waffles, LLC)*, 702 F.3d 850, 857 (6th Cir. 2012); *In re Wilkinson*, 196 F. App'x at 343.

Defendant initially argued that the Brinnon Transfers were made by Sodalis and not the Debtor and that the Brinnon Transfers were a dollar- for-dollar reduction of Sodalis' obligation

11

to pay under the Novation Agreement. However, Plaintiff has clearly shown from the Debtor's wire transfer records and the deposition of Roy Brown, Roy Brown Dep. 6:18-7:9, that the Debtor, not Sodalis, made the Brinnon Transfers, and the Debtor's obligation to pay the Defendant ceased when Sodalis assumed the Debtor's payment obligation under the Novation Agreement. Accordingly, Plaintiff argues that there was no reasonably equivalent value given to the Debtor for the Brinnon Transfers and to the extent Defendant asserts otherwise, the Court finds genuine issues of material fact exist.

In viewing the transactions between the Debtor, the Defendant and Sodalis, transfers involving the Debtor occurred on three occasions – 1) when the Debtor redeemed the Defendant's BPC shares, 2) when Sodalis assumed the Debtor's obligation under the Promissory Note; and 3) when the Brinnon Transfers were made from 2006 to 2008. It is undisputed that the Defendant gave value to the Debtor in 1999 when she withdrew from The B's Nest and had her stock in BPC redeemed in exchange for payments under the Promissory Note and there existed an antecedent debt owed to the Defendant. However, there is no evidence that the value of the BPC shares redeemed by the Debtor and the Defendant's withdrawal from The B's Nest were reasonably equivalent to the $9,380,647.40 Promissory Note the Debtor gave to the Defendant. There was no appraisal conducted regarding the value of the BPC shares redeemed. As set forth in section 1.1 of the Partnership Withdrawal Agreement, Roy Brown, Clancy Brown and the Defendant waived the appraisal requirement and agreed that the aggregate market value of the BPC shares held by the Defendant was $9,380,647.40.

Roy Brown determined the value of the redeemed BPC shares by referring to multiples for publicly traded companies listed in newsletters issued by Dirks Van Essen at the time and

consulted general information about multiples for newspaper companies issued annually by an outside accounting firm to arrive at a multiple for the Debtor and applied a discount to that multiple based upon the fact that the Debtor was acquiring minority shares of a closely-held company. Roy Brown Dep. 48:19-52:6. The Defendant has not provided any information demonstrating that the multiples used were reasonable and appropriate and that the $9,380,647.40 was the fair market value of the BPC shares at the time.

The uncertainty regarding whether the value of the BPC shares redeemed were reasonably equivalent to the value of the Promissory Note carries through to whether the outstanding liability under the Promissory Note assumed by Sodalis in 2001 was reasonably equivalent to the value of the Class B Preferred Shares given to Sodalis. The number of Class B Preferred Shares issued by the Debtor was approximately the outstanding balance under the Promissory Note divided by the par value of each of the Class B Preferred Shares. There was also no appraisal of the Class B Preferred Shares at the time they were issued to Sodalis. Roy Brown Dep. 88:9-18. Moreover, the exchange of a debt liability for an equity interest may not be equivalent because unlike debt which has a maturity date, there was no agreement between the Debtor and Sodalis that distributions with respect to the Class B Preferred Shares would be limited to the amount of the outstanding obligation under the Promissory Note. In addition, the dividends on the Class B Preferred Shares were cumulative, compounding on a quarterly basis at a rate of 6.3% per year, which is greater than the 5.62% interest under the Promissory Note and therefore, it would appear that the dividends accrued on the Class B Preferred Shares and paid by the Debtor with respect to the Brinnon Transfers exceeded the value of the Promissory Note.

With respect to the Brinnon Transfers themselves which were subsequent to the creation

of the Novation Agreement, the Defendant argued that at the time of each of the Brinnon Transfers, such transfers represented a dollar-for-dollar reduction of the Debtor's obligation to pay Sodalis with respect to accrued dividends and the redemption of Class B Preferred Shares, which also satisfied Sodalis's obligation to make payments to the Defendant under the Novation Agreement. However, no evidence has been presented demonstrating any agreement between the Debtor and Sodalis requiring the Debtor to pay the distributions directly to the Defendant and that the Brinnon Transfers would result in dollar-for-dollar reduction of the Debtor's obligation to pay distributions to Sodalis. The Court does not have any evidence showing a receipt of distributions on Sodalis's books and records with a corresponding reduction of its obligation to pay the Defendant as a result of the Brinnon Transfers.

In addition, there is a question of material fact as to whether the dividend payments and redemption of the Class B Preferred Shares actually constituted a dollar-for-dollar reduction of Sodalis' payment obligation to the Defendant. The Debtor's records concerning accrued dividends on the Class B Preferred Shares for fiscal years 2002 through 2009 show there were adjustments for shares redeemed and shares sold. Pl.'s Decl. Supp. Opp'n Summ. J., Ex. B. Yet, pursuant to Exhibits A and B to the amendment to the Novation Agreement, the number of Class B Preferred Shares held by Sodalis on January 31, 2001 and on January 4, 2008 remained unchanged at 3,864.95 shares. Furthermore, the dividend payments noted on the Debtor's records do not bear any relationship to the actual amounts of the Brinnon Transfers made and there is insufficient information as to exactly when the payments were made. The records show that the first dividend payment on the Class B Preferred Shares was made in fiscal year 2007 when $1,600,000 in dividends was paid but the exact payment date(s) is not listed. Yet, the only

14

Brinnon Transfer received by the Defendant in 2007 was a $20,000 payment on June 11, 2007. If the Court were to include the $1,000,000 payment on September 6, 2006 and $500,000 payment on September 12, 2006, the sum of those payments would be under the $1,600,000 reflected in the Debtor's records.

Lastly, according to the Debtor's amended articles of incorporation, dividends on the Class B Preferred Shares are subject to the preferences and priorities of a holder of the Debtor's Class A Preferred Shares and are to be paid to the extent funds are legally available and declared by the Debtor's board of directors. Pursuant to Ohio Rev. Code Ann. § 1701.33, directors of a corporation may declare dividends and distribution on outstanding shares but:

> (C) No dividend or distribution shall be paid to the holders of shares of any class in violation of the rights of the holders of shares of any other class, or when the corporation is insolvent or there is reasonable ground to believe that by such payment it would be rendered insolvent.
>
> *       *       *
>
> (F) When any portion of a dividend or distribution is paid out of capital surplus, the corporation, at the time of paying the dividend or distribution, shall notify the shareholders receiving the dividend or distribution as to the kind of surplus out of which the dividend or distribution is paid.

Ohio Rev. Code Ann. § 1701.33 (C) and (F) (LexisNexis 2013).

No minutes from the Debtor's board meetings have been provided showing that (i) dividends on the Class B Preferred Shares were declared close in time to the dates of the Brinnon Transfers, (ii) dividends on the Class A Preferred Shares had been paid prior to the payment on the Class B Preferred Shares, (iii) the Debtor notified Sodalis as to the kind of surplus out of which the dividends were paid, or (iv) the payment of the dividends to the Defendant on behalf of Sodalis was authorized, regardless of whether certain of the Debtor's officers and directors had knowledge of Sodalis' entitlement to dividends. In addition, as discussed below, there are

15

issues of whether the funds for the dividends were legally available and whether the Brinnon

Transfers were made when the Debtor was insolvent or rendered insolvent as a result, or had

unreasonably small capital, or resulted in the inability to pay its debts as they became due. If the

Debtor's dividend payments on the Class B Preferred Shares were unauthorized, then it is

questionable whether reasonably equivalent value was received by the Debtor for the Brinnon

Transfers even if they represented distributions owed to Sodalis. Thus, Plaintiff has made a

sufficient showing that what the Debtor received may not have been reasonably equivalent value

for the Brinnon Transfers.

### 4. Whether the Debtor Was Insolvent.

A debtor is considered insolvent if the sum of the debtor's debts exceeds all of the

debtor's assets "at a fair valuation." Ohio Rev. Code Ann. § 1336.02(A)(1). A debtor is also

presumed to be insolvent if he is not generally paying his debts as they become due. Ohio Rev.

Code Ann. § 1336.02(A)(2). "Insolvency is essentially a balance-sheet test." *In re Canyon Sys.*

*Corp.*, 343 B.R. at 647 (citing *Foreman Indus., Inc. v. Broadway Sand & Gravel (Matter of*

*Foreman Indus., Inc.)*, 59 B.R. 145, 149 (Bankr. S.D. Ohio 1986). A debtor's ability to pay its

debts as they mature would be irrelevant if it is determined that the debtor's balance sheets show

that it is insolvent. However, where evidence of balance sheet insolvency appears to be

speculative or inconclusive, then the debtor's ability to pay may be relevant. *Ohio Corrugating*

*Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 439 (Bankr. N.D. Ohio 1988). The

Plaintiff bears the burden of proving insolvency by the preponderance of the evidence. *In re*

*Canyon Sys. Corp.*, 343 B.R. at 647.

Plaintiff retained the services of Gettry Marcus CPA, P.C. to determine the Debtor's

insolvency at the time of the Brinnon Transfers. Mark S. Warshavsky, the Partner in Charge of

the Business Valuation and Litigation Group at Gettry Marcus, submitted an affidavit sworn to

on January 8, 2014 (the "Warshavsky Aff.") concluding that the Debtor was balance sheet

insolvent.

In determining whether the Debtor had sufficient capital or was able to pay its debts as

they became due, Warshavsky reviewed the Debtor's financial condition for 2006, 2007, 2008

and 2009 and compared it to the financial condition of the Debtor's peers for those same years.

Warshavsky concluded from his analysis of certain ratios associated with working capital,

financial solvency/liquidity, and coverage/leverage that the Debtor was worse off than most in

the industry during 2006, 2007 and 2009 and thus, the Brinnon Transfers left the Debtor with

unreasonably small capital and an inability to meet its financial obligations as they became due.

While fiscal year 2008 was more positive, Warshavsky reasoned that the Debtor's financial

condition in 2008 did not represent an accurate picture of the Debtor's on-going business

operations because the Debtor acquired 7 publishing units and sold one of its existing units in

that year which generated $32 million. Putting aside that sale of the publishing unit, the Debtor

had a $4 million net operating loss for 2008 from operation of its business which reduced its net

income for that year to $28 million.

While the Debtor's ratios may be inferior to those of its peers, such an analysis is a

relative one and no information is given about the financial condition of the Debtor's peers.

Unless evidence is given to demonstrate that the Debtor's peers had relatively small capital and

were unable to pay their debts as they become due, the Court cannot conclude that the Debtor

had the same financial difficulty based upon these ratios. The only conclusion the Court can infer

17

is that the Debtor was not performing as well as its peers but the ratios do not give any insight as to the Debtor's actual financial condition on or around the dates of the Brinnon Transfers.

As for the insolvency analysis, due to a lack of documents relating to the Debtor's financial condition on the actual dates of the Brinnon Transfers, Warshavsky focused on three of the largest Brinnon Transfers – $1 million on September 5, 2006, $500,000 on September 12, 2006 and $800,000 on January 4, 2008. With respect to the first two transfers, Warshavsky performed a balance sheet test by looking at the book value of the Debtor's assets and liabilities stated on its audited fiscal year end statements dated February 26, 2006, and February 25, 2007 and applied the principle of retrojection in his analysis.  Under the principle of retrojection, if a debtor is shown to be insolvent on a date prior to the transaction and on a date subsequent to the same transaction, and there are no substantial changes in the debtor's assets and liabilities between those dates, then the debtor is deemed to have been insolvent at all times during the intermediate dates. The February 26, 2006 statement shows $80,425,428 in assets and $83,411,590 in liabilities, and the February 25, 2007 statement shows $77,894,102 in assets and $86,105,690 in liabilities. Warshavsky concludes that the Debtor was insolvent on February 26, 2006 and February 25, 2007 and there were no significant change to the Debtor's financial condition during the times in between those dates, and therefore, the Debtor was insolvent in September of 2006 when the Debtor transferred $1,500,000 to the Defendant.

With respect to the $800,000 transfer on January 4, 2008, Warshavsky was able to obtain a balance sheet dated that same date which shows a book value of $87,161,694 in assets and $96,183,731 in liabilities. Therefore, Warshavsky concluded that the Debtor was also insolvent on January 4, 2008.

While Warshavsky's use of book value is an acceptable method of analyzing whether a debtor is insolvent under certain circumstances, Ohio law requires the use of fair value. The Court does not have sufficient information to conclude whether the Debtor's fair value of the Debtor's liabilities exceed the fair value of its assets. However, the absence the such information does not necessarily mean that the Debtor was solvent and able to pay all its debts as they became due or that the Plaintiff would not be able to prove at trial insolvency and other issues of material fact raised by the Court if given additional time to conduct the appropriate valuation.

Indeed, other evidence submitted indicated that the Debtor had periods of financial difficulty or reduced capital with which to pay its bills. Although the Debtor did not file for bankruptcy protection until two years after the last Brinnon Transfer, a review of correspondence between Roy Brown and the Defendant or her counsel indicates that the Debtor was unable to make distributions, whether directly or indirectly, to the Defendant because the Debtor had large or multiple payment obligations that came due around the same time which required the Debtor to make choices as to which obligations it should pay first. With respect to the Brinnon Transfers that occurred in July of 2008, according to an email dated July 7, 2008, Roy Brown conveyed to the Defendant that the Debtor had difficultly making the payments to her.

> Our situation is as follows. Your payment date coincided with a payroll and a large principal/interest payment to banks that left us with no cash at the beginning of the month. We thought there would be more left over but a bad swap made the interest amount higher than anticipated. We can safely pay the payment by July 18 (end of next week.) In the interim, we could forward a small payment . . . .

Warshavsky Aff., Ex. I.

However, the Court does not have sufficient information to determine whether such periods of small capital or insufficient cash flow were persistent and covered the dates of the

19

Brinnon Transfers, or were temporary and unrelated to the Brinnon Transfers. On the other hand, the court has conflicting information regarding the Debtor's capital because the Debtor was able to obtain a $124 million loan in September of 2007 even though the Debtor suffered a net loss of $4.4 million in 2007 and would have a net loss of $ 4 million in 2008 from operations were it not for the sale of one of its publishing units.

Where there exist numerous issues of material fact on the various badges of fraud, and not just on insolvency, the granting of summary judgment would be inappropriate as a trial would be necessary to resolve these issues.  A court may deny summary judgment where the facts do not "furnish an adequate basis for the court to apply the proper legal principles in resolving a difficult question of law." *Bingham v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). Summary judgment requires a clear showing that there are no disputes as to material facts in order for the court to decide on the law. The court has judicial discretion in evaluating the materials submitted to the court to resolve the legal issues before it.

> Although the general rule is that difficult legal issues do not preclude summary judgment, it also has been held that difficult or complicated legal issues should not be adjudicated upon an inadequate record. As a result, an appraisal of the legal issues may lead a court to exercise its discretion and deny summary judgment in order to obtain the fuller factual foundation afforded by a plenary trial.

*Wright & Miller, et. al.*, 10A Fed. Prac. & Proc. Civ. § 2728 (3d ed. 2013).

Here, there are numerous issues concerning whether (i) the Debtor made the Brinnon Transfers in response to a threat of pending litigation, (ii) the Brinnon Transfers were concealed; (iii) the Debtor received reasonable equivalent value for the Brinnon Transfers, and (iv) the Debtor was insolvent, or had small capital or was unable to pay its debts as they became due, which should be determined at trial rather than on summary judgment. The Court is also

20

cognizant that the Plaintiff and its counsel was substituted after this Summary Judgment Motion was brought and had only a limited period of time to become familiar with the facts of this complex bankruptcy case and to conduct factual discovery. Notwithstanding the extensions of time given to allow the Plaintiff to complete its discovery, given the complexity of this bankruptcy case and the Debtor's operations and numerous transactions with various insiders and non-debtor related parties, the limited time Plaintiff had may not have been sufficient. Based upon the foregoing issues raised and, more significantly, the preclusive effect a determination of insolvency/solvency would have with respect to the remainder of the causes of action the Plaintiff has asserted against the other defendants in this and other adversary proceedings, the Court finds that the Defendant's Summary Judgment Motion to dismiss count VI would be inappropriate and premature at this juncture.

B.    *Counts VII to IX - Constructive Fraudulent Transfers and Unjust Enrichment.*

The Defendant also seeks dismissal of counts VII through IX which seek to avoid the Brinnon Transfers as constructive fraudulent transfers. Under Ohio law, a transfer is fraudulent with respect to a creditor if the debtor made the transfer:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
>> (A) The debtor was engaged or was about to engage in a business or transfer for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>> (B)The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they become due.

Ohio Rev. Code Ann. §1336.04(A)(2). As discussed above, a determination with respect to the Defendant's Summary Judgment Motion with respect to counts VII through IX is also premature

at this time.

<u>CONCLUSION</u>

Based upon the foregoing, the Court finds that there are no genuine issues of fact with respect to the Defendant's Summary Judgment Motion relating to counts XXI through XXIV concerning the payments by the Debtor to AXA Equitable Life Insurance Company, and therefore, the Defendant's Summary Judgment Motion to dismiss counts XXI through XXIV against only this Defendant is granted. With respect to counts VI through IX, the Court finds that there are genuine issues of material fact that should be determined at trial; and therefore, the Defendant's Summary Judgment Motion to dismiss counts VI through IX against the Defendant is denied.

So Ordered.



**Dated: Central Islip, New York**
      **March 20, 2014**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**