UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

Case No.  10-73295-reg

THE BROWN PUBLISHING COMPANY,
DPI LIQUIDATION INC., BROWN MEDIA
HOLDINGS COMPANY, BOULDER BUSINESS
INFORMATION INC., BROWN BUSINESS
LEDGER, LLC, BROWN PUBLISHING INC., LLC,
BUSINESS PUBLICATIONS, LLC, THE
DELAWARE GAZETTE COMPANY, DC BIZ
NEWS, LLC, TEXAS COMMUNITY
NEWSPAPERS, INC., TEXAS BUSINESS
NEWS, LLC, TROY DAILY NEWS INC.,
UPSTATE BUSINESS NEWS, LLC, UTAH
BUSINESS PUBLISHERS, LLC, ARG, LLC,

                              Debtors.
------------------------------------------------------------------x
THE BROWN PUBLISHING COMPANY
LIQUIDATING TRUST,

                    Plaintiff,                              Adv. Proc. No. 12-08193-reg

vs.

ROY E. BROWN, CLARENCE J. BROWN III,
CLARENCE BROWN, JR., JOYCE E. BROWN,
DOROTHY HAINES, RICHARD HAINES,
CATHERINE BROWN BRINNON, CRJ
INVESTMENTS LLC, AEG EQUITY HOLDINGS,
LTD., SODALIS, LLC AND B'S NEST PARTNERSHIP,

                              Defendants.
------------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER**

Before the Court is a motion by defendants[1] Roy E. Brown ("Roy Brown"), Clarence J. Brown III ("Clancy Brown"), CRJ Investments LLC ("CRJ"), Sodalis LLC ("Sodalis"), AEG Equity Holdings Inc. ("AEG"), and B's Nest Partnership ("B's Nest") (together the "Brown Defendants"), and a motion by Richard Haines and Dorothy Haines (together the "Haines Defendants") (collectively the "Defendants") seeking to dismiss a complaint filed by the Brown Publishing Company Liquidating Trust ("Liquidating Trust" or "Plaintiff"), the successor to the debtors Brown Publishing Company ("BPC"), Brown Media Holdings ("BMH"), and their subsidiaries[2] (collectively the "Debtors"). The complaint seeks relief against the Defendants for violations of Bankruptcy Code sections 502, 503, 544, 547, and 550 as well as Ohio Rev. Code §§ 1701.59, 1701.60, 1336.04, 1336.05, and Ohio common law. The claim for preferential transfer is brought under the Bankruptcy Code while the remaining claims for breach of fiduciary duty, insider transfers, and fraudulent transfers are brought solely pursuant to Ohio statute and Ohio common law.[3] In deciding those counts the Court applies Ohio law.

The Brown Defendants and the Haines Defendants each filed a motion for summary judgment.[4] Subsequently, the Plaintiff agreed to dismiss several counts in the complaint against Roy Brown, Dorothy Haines, Clancy Brown, B's Nest, and AEG.[5] The remaining counts, which are the subject of the two motions, are counts 4-5 for breach of Roy and/or Clancy Brown's

---

[1]     Clarence Brown Jr. and Joyce Brown also filed a motion for summary judgment but that case has been settled. The claims associated with Catherine Brinnon have been addressed in a previous Memorandum Decision and Order by Judge Eisenberg on March 20, 2014 and are not the subject of this Decision.

[2]     The subsidiaries are DPI Liquidation Inc., Boulder Business Information Inc., Brown Business Ledger LLC, Brown Publishing Inc., Business Publications LLC, the Delaware Gazette Company, SC Biz News LLC, Texas Community Newspapers Inc., and Texas Business News LLC.

[3]     The Plaintiff does not bring any of the claims for fraudulent transfer under 11 U.S.C. § 548.

[4]     The summary judgment motions contested all of the claims brought by the Plaintiff except for count 1 and count 25 against Roy Brown for breach of contract and to deny his administrative expense requests, and count 26 against all Defendants for disallowance of claims.

[5]     Since all of the claims against AEG have been discontinued, AEG is no longer the subject of this adversary proceeding.

fiduciary duties under Ohio law arising from a release that BPC executed in favor of Roy Brown (the "Release Counts"), counts 6-9 against Roy Brown, Clancy Brown, Sodalis, and B's Nest seeking the recovery of intentional and constructive fraudulent transfers under Ohio Law that were made to Catherine Brown Brinnon ("Cate Brinnon") (the "Brinnon Counts"), counts 10 and 11 against Richard Haines, and counts 13 and 14 against Dorothy Haines seeking the recovery of constructive fraudulent transfers under Ohio Law that were made to Richard and Dorothy Haines (the "Haines Counts"), count 19 against Roy Brown, Clancy Brown, and CRJ seeking the recovery of insider transfers under Ohio law for rental payments made to CRJ (the "Rental Counts"), and counts 21-24 seeking the recovery of preferential transfers under the Bankruptcy Code and fraudulent transfers under Ohio law against Roy Brown, Clancy Brown, and B's Nest for life insurance premiums that BPC paid on behalf of B's Nest (the "Life Insurance Counts").

A hearing was held by this Court on October 23, 2014 addressing both motions.  The Court finds that the Release Counts, a portion of the Brinnon Counts, the Rental Counts, and the Life Insurance Counts can be resolved on summary judgment. The remaining counts—which consist of the Haines Counts and the residual Brinnon Counts—involve a determination of the financial status of BPC at the time of the transfers and thus are not suitable for summary judgment.

The Court grants summary judgment and dismisses the Release Counts against Roy Brown and Clancy Brown because the Plaintiff cannot demonstrate that the release of Roy Brown's loan obligations (the "Release") caused any proximate damage to BPC, a requirement for any breach of fiduciary duty claim under Ohio law.  Roy Brown's subsequent waiver of any rights and defenses under the Release renders it a nullity, thereby precluding BPC from sustaining any damages from its issuance.

The Court also grants summary judgment and dismisses the Brinnon Counts with regard to Roy Brown, Clancy Brown, and B's Nest because under section 550(a)(1) these defendants did not receive any benefit from the transfers that BPC made to Cate Brinnon.  However, since Sodalis did receive a benefit from those transfers, the Brinnon Counts will not be dismissed as to Sodalis.

In addition the Court grants summary judgment and dismisses the Rental Counts against Roy Brown, Clancy Brown, and CRJ because the transfers made to CRJ pursuant to the amended leases were not fraudulent under Ohio law.  Transfers made in exchange for new value are exempt from recovery under applicable Ohio constructive fraudulent statutes.  Here, the amended leases were at fair market rate and new value was provided each month in the form of the Debtors' continued use and occupancy of the property.

 Summary judgment is also granted and the Court dismisses the Life Insurance Counts since the underlying transfers at issue are true loans from BPC to B's Nest that will be repaid from the insurance proceeds. Such true loans cannot be considered fraudulent transfers under Ohio law.  The transfers also cannot be preferences under the Bankruptcy Code since they were not done on behalf of an antecedent debt owed by BPC.

Summary judgment is not proper for Richard and Dorothy Haines with respect to the Haines Counts and for Sodalis with respect to the Brinnon Counts because those counts require a factual determination regarding BPC's financial status at the time of the transfers.  Under Ohio Law the Plaintiff must demonstrate that the transfers in question were not made in exchange for reasonably equivalent value *and* either that BPC was insolvent, engaged in a business or transaction for which the remaining assets were unreasonably small, or intended to incur or reasonably should have believed that the BPC would incur debts beyond its ability to pay as they

became due.  This determination is inherently a question of fact that cannot be resolved on a

motion for summary judgment, especially since both parties present contrasting pictures of

BPC's financial health at the time of the transfers.  Both parties rely in part on expert reports

whose accuracy and methodology have been challenged on various grounds. Since a

determination of BPC's financial status is a factual question, the Court finds that it does not need

to rule on the admissibility of the experts' reports at this time and reserves the right to address

any such issues at trial.

The remaining counts will be dealt with at a trial on May 14, 2015 at 10AM.

## Facts[6]

The Debtors were a consortium of newspaper and publishing companies that were

organized as closely held corporations under Ohio law.  Amended Complaint ¶ 4 April 30, 2012.

Through their subsidiaries the Debtors operated newspapers all over the United States.  On April

30 and May 1, 2010 (the "Petition Dates") the Debtors filed for relief under Chapter 11 of the

Bankruptcy Code, and during the pendency of the Chapter 11 cases the Debtors continued to

operate the business until BPC was dissolved on June 22, 2011.  *Id*. at ¶¶ 4, 19.  BPC was

dissolved pursuant to an Order Confirming Third Amended Joint Plan of Liquidation of The

Brown Publishing Company, Brown Media Holdings Company, Their Respective Debtor

Affiliates and Subsidiaries dated June 16, 2011 (the "Confirmation Order") which established a

Liquidating Trust.  On April 30, 2012 the Liquidating Trust brought this instant adversary

proceeding against the Defendants.

BPC's CEO was Roy Brown and his brother, Clancy Brown, served as Chairman of

BPC's Board of Directors.  *Id*. at ¶¶ 25-26.  Other members of the Board included Roy and

---

[6]     These facts represent undisputed facts as identified by both parties.  Those facts that are alleged
or disputed are highlighted as such.

Clancy's father Clarence Brown Jr. ("Bud Brown"), and their mother and Bud's wife Joyce Brown. *Id*. at ¶¶ 6-8. Additional family members, while not involved in the management of the company, owned shares in BPC. These included Roy's sister Cate Brinnon, his aunt Dorothy Haines who is also Bud Brown's sister, and his cousin Richard Haines who is Dorothy Haines' son. *Id*. at ¶¶ 9-11. Joel Dempsey served as general counsel to the Debtors. Joel Dempsey Declaration. ¶ 2 September 2, 2014. Members of the Brown family also owned a number of separate corporations, all incorporated under Ohio law, which often did business with BPC. Am. Compl. ¶¶ 12-14. These included CRJ and Sodalis whose members are Clancy Brown, Roy Brown, and Joel Dempsey; and B's Nest whose partners are currently Roy Brown and Clancy Brown. *Id*. Cate Brinnon had been a partner of B's Nest but she resigned prior to 1999. The three principals divided ownership of CRJ and Sodalis with Joel Dempsey owning 20%, Roy Brown 33.3%, and Clancy Brown 46.7%. Joel Dempsey Decl. ¶ 11. In addition Joel Dempsey held the positions of Managing Member of Sodalis and President of CRJ. *Id*. at ¶ 3.

*The Release*

On June 14, 2002 Roy Brown executed a loan agreement with BPC for $1,350,250.00 which included—per a July 2006 amendment—a provision that failure to pay back the loan by June 30, 2009 would mandate a surrender of Roy Brown's partnership interest in B's Nest (the "Loan"). Am. Compl. ¶¶ 27-32. Roy Brown failed to repay the Loan by the required date but on February 19, 2010 he obtained a Release from Clancy Brown, acting in his capacity as Chairman of the Board of Directors of BPC, which exempted Roy Brown from all claims and causes of action arising out of the Loan in exchange for the surrender of all of Roy Brown's shares in BPC. *Id*. at ¶¶ 33-38. After the filing of this adversary proceeding, Roy Brown agreed to waive all

rights and defenses arising under the Release.  (Roy Brown Affidavit ¶ 6 May 29, 2014, ECF No. 187).

*The Brinnon Transfers*

Beginning in 1999, a number of Brown family members entered into stock redemption agreements with BPC.  On November 17, 1999 Cate Brinnon entered into a stock redemption agreement with BPC in which she agreed to exchange 6,478 shares of common stock for $9,380,647.40 (the "Brinnon Stock Agreement").  Roy Brown Aff. ¶ 28.  In order to secure a $2,842,154.00 pre-payment under the Brinnon Stock Agreement, Cate Brinnon entered into a novation agreement on January 31, 2001 with BPC and Sodalis whereby BPC was released from its obligations under the Brinnon Stock Agreement and Sodalis agreed to undertake all subsequent obligations to pay Cate Brinnon (the "Novation Agreement").  *Id*. at ¶ 29; Novation Agreement §§ A1-5, B3 January 31, 2001, ECF No. 214 Exhibit 17.  Under the Novation Agreement B's Nest would continue to guarantee subsequent obligations on a non-recourse basis.  Novation Agreement § B7.  In order for Sodalis to meet its obligations under the Novation Agreement, Sodalis was issued 3,864.95 shares of preferred stock in BPC with the dividends of those shares to be used to cover the payments to Cate Brinnon.  *Id*. at §§ B6-B7; Roy Brown Aff. ¶ 30. However, for reasons that remain unclear, Sodalis never actually received any of the BPC preferred stock, it was placed in escrow to be released to Sodalis only after Cate Brinnon was paid in full, which never occurred.  Roy Brown Aff. ¶¶ 30-31.

After Cate Brinnon received her pre-payment, a total of $5,757,155.87 remained outstanding under the Brinnon Stock Agreement.  Novation Agreement § B1.  In October and December of 2007 Roy Brown and Joel Dempsey received emails from Cate Brinnon's lawyer requesting immediate payment of the remaining funds that Cate Brinnon was owed.  ECF No.

214 Exhibit 22, 23.   On January 4, 2008 Sodalis and Cate Brinnon amended the Novation

Agreement to provide that Sodalis would transfer $800,000.00 to Cate Brinnon to be applied to

the principal and interest owed to her.  Am. Compl. ¶ 43.  However, between September 5, 2006

and July 25, 2008, BPC made five payments to Cate Brinnon totaling $2,465,000.00 (the

"Brinnon Transfers").  *Id*. at ¶ 44.  At no time did Sodalis transfer any funds to Cate Brinnon.

Roy Brown Aff. ¶¶ 31-32.

*The Haines Transfers*

BPC also entered into stock redemption agreements with Dorothy and Richard Haines.

In June of 2006, BPC entered into a $75,000,000.00 credit agreement with Wells Fargo Bank

and used part of those funds to redeem and purchase its own stock.  Roy Brown Decl. in support

of Richard and Dorothy Haines ("Roy Brown Haines Decl." ¶¶ 26-28 May 30, 2014 ECF No.

196).  Before any of the stock purchase agreements were executed Dorothy Haines owned 2,200

common shares of BPC and Richard Haines owned 1,500 shares.  Roy Brown Decl. ¶¶ 8, 18.

Each of them entered into three stock redemption agreements with BPC[7] and one stock purchase

agreement with AEG.[8]  *Id*. at ¶¶ 8-9, 18-19.  As part of a second stock redemption agreement

dated March 31, 2007 Dorothy and Richard Haines each redeemed 147 shares in exchange for

$250,000.00 apiece for a total of $500,000.00 (the "Haines Stock Agreement March 2007").  *Id*.

at ¶¶ 10, 20.  The Haines Defendants also entered into a third stock redemption agreement dated

October 1, 2007 where they each redeemed their individual 588 shares in exchange for $1

million apiece for a total of $ 2 million dollars (the "Haines Stock Agreement Oct 2007")

(collectively the "Haines Transfers").  *Id*. at ¶¶ 11, 21.  Roy Brown alleges that he fixed the

value of BPC stock after reviewing a valuation report produced by Dirks, Van Essen & Murray

---

[7]      The first stock redemption agreement in 2006 is not the subject of any action by the Plaintiff.
[8]      While the complaint originally included claims that arose from the stock purchase with AEG,
those claims have since been withdrawn.

("Dirks") dated June 22, 2006 which valued all of BPC's stock at $81,000,628.00 (the "Dirks Report") and then applying different discounts. Roy Brown Haines Decl. ¶¶ 8-15. After applying these discounts Roy Brown allegedly concluded that a fair price for the Haines shares was $1,700 per share for a total of $6.29 million. *Id*. at ¶ 17.

*CRJ Rent Payments*

CRJ owns multiple real properties and leased several of those properties to BPC and BMH (the "CRJ Properties"). Roy Brown Decl. ¶ 34. On August 1, 2008 BPC and BMH entered into leases for the CRJ Properties for a total of $860,656.00 in annual rent payments (the "Leases"). Am. Compl. ¶¶ 58, 59. The Leases reflected a rental price that included rent concessions in the aggregate amount of $496,216.00 and language which mandated that the Debtors would pay CRJ $747,824.00 if the Leases were terminated early. Roy Brown Decl. ¶ 35. On June 5, 2009, the Wilmington Trust notified BPC that it was in default on a credit agreement triggering a default by CRJ under its own credit agreement with its lender Huntington Bank. *Id*. at ¶¶ 38-39. According to the Brown Defendants Huntington Bank would only refrain from foreclosing on the CRJ Properties if CRJ increased the rental rates under the Leases to reflect market rates. *Id*. at ¶ 42. On August 31, 2009 CRJ entered into amended leases with BPC and BMH which included a combined rent increase of $1,416,857.00 to match the alleged fair market value of the rentals and prevented Huntington Bank from foreclosing on the CRJ Properties (the "Amended Leases"). *Id*. at ¶ 44; Am. Compl. ¶¶ 60, 61. The Amended Leases also included an agreement that CRJ would not require the Debtors to purchase the CRJ Properties or demand the $747,824.00 early termination fee. Roy Brown Decl. ¶ 45. From October 1, 2009 until the Petition Dates the Debtors paid CRJ $405,080.00 under the terms of the Amended Leases. Am. Compl. ¶ 62.

*Life Insurance Premiums*

B's Nest owns life insurance policies on Clarence Brown Jr. and Joyce Brown (the "Policy"), issued by AXA/Equitable Life Insurance ("AXA") in 2005.  Roy Brown Decl. ¶ 52. BPC paid AXA the premiums on the Policy, four payments of $75,000.00 between December 2006 and October 2009 for a total of $300,000.00. Am. Compl. ¶¶ 72-73.  Roy Brown alleges that these premiums were a loan from BPC and that B's Nest, the beneficiary of the Policy, will pay back the $300,000.000 plus four percent interest when the Policy is paid out.  Roy Brown Decl. ¶ 53).  As evidence of this loan Roy Brown points to a report by the Huron Consulting Group describing the loan, an email from the Debtors' Comptroller to the Debtors' general counsel, the Debtors' 2006-2009 financial statements, and the CFO's deposition.  *Id.* at ¶¶ 54-57.

**Procedural History**

K&L Gates served as original counsel to Debtors and to the Liquidating Trust which was created pursuant to the Confirmation Order.  In March of 2012 Roy Brown sought to remove K&L Gates as counsel due to an alleged conflict of interest.  After several evidentiary hearings Judge Eisenberg in a Memorandum Decision on April 29, 2013 held that K&L Gates had failed to adequately inform the Court of its prior relationship with various creditors and parties in interest.  K&L Gates was removed as counsel and McLaughlin & Stern was retained.

Judge Eisenberg addressed the claims against Cate Brinnon in a Memorandum Decision and Order on March 20, 2014 ("Brown I") and denied summary judgment to counts 6 through 9 because there were genuine issues of material fact that needed to be determined at trial.[9] Following Judge Eisenberg's retirement, the case was transferred to Judge Grossman.  Hearings on the two summary judgment motions took place on October 23, 2014.  The Court then asked

---

[9]     Plaintiff had also brought counts 21 through 24 against Cate Brinnon but dismissed them prior to Judge Eisenberg's Decision.

for supplemental briefs on the narrow question of whether the second Warshavsky affidavit submitted by the Plaintiff on July 28, 2014 (the "Second Warshavsky Affidavit"), six months after discovery closed on Jan. 31, 2014, was barred as a new opinion or was admissible as a further explanation of an earlier report.

**Discussion**

<u>Summary Judgment Standard</u>

The Defendants have moved to dismiss the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure[10] which states, in pertinent part, that a moving party shall be granted summary judgment, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Accordingly, in ruling upon a summary judgment motion the Court is to determine whether a genuine issue of fact exists, not to resolve disputed issues of fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must resolve all ambiguities and draw reasonable inferences in favor of the nonmoving party.  *Thornton v. Syracuse Sav. Bank,* 961 F.2d 1042 (2d Cir.1992); *Levin v. Analysis & Tech., Inc.,* 960 F.2d 314 (2d Cir.1992).  Factual allegations backed by affidavits or other evidence made by the party opposing the motion must be regarded as true and viewed in the light most favorable to the non-movant. *Cartier v. Lussier,* 955 F.2d 841 (2d Cir.1992).

---

[10]    Rule 56 governs the motion for summary judgment in this adversary proceeding by virtue of Fed. R. Bankr.P. 7056.

I.    RELEASE COUNTS AGAINST ROY AND CLANCY BROWN

Under Ohio law, a breach of fiduciary duty claim requires: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Valente v. University of Dayton*, 438 Fed.Appx. 381, 387 (6th Cir. 2011)(internal quotation marks and citations omitted). The duties and the standard of care that directors must employ is outlined in Ohio Rev. Code §§ 7101.59(B)-(D) and 7101.60(A). Ohio courts explain that the injury or damage that results from the breach is "a vital element" needed to sustain a claim for breach of fiduciary duty. *Massara v. Henery*, No. 19646, 2000 WL 1729457, at *3 (Ohio Ct. App. Nov. 22, 2000). Any injury or resulting damage "must be shown with certainty and not be left to conjecture and speculation." *Huffman v. Groff*, No 10-54, 2013 WL 312395, at *7 (Ohio Ct. App. January 23, 2013). Specifically, proximate cause requires a "probable or likely result, not merely a possible one." *Morgan v. Ramby*, Nos. CA2010-10-095 2012 WL 626209, at *4 (Ohio Ct. App. February 27, 2012) (internal citations omitted).

Here, the breach of fiduciary duty claims must be dismissed because the Release did not cause any injury to BPC in light of Roy Brown's waiver of any rights and defenses associated with the Release.[11] The waiver allows any party with standing to pursue Roy Brown for the Loan, ensuring that the Release is a nullity. The Plaintiff claims that the injury occurred when the Release was first granted but there is nothing in the record to support a finding of any injury at all to BPC resulting from the Release. Ohio courts have consistently found that if the breach of fiduciary duty was not the proximate cause of damage, then the claims must be dismissed. *See Huffman*, 2013 WL 312395 at *7 (Court upheld dismissal of breach of fiduciary duty claim since there was no evidence that the Plaintiff had suffered or will suffer any damages from

---

[11]    Since the Court finds that BPC suffered no proximate damage and thus there cannot be a successful breach of fiduciary claim, the Court need not determine whether Roy and Clancy Brown had a duty to the Debtors and whether they breached any such duty.

failure to purchase property that did not generate profit or pay any dividend); *Morgan*, 2012 WL 626209 at *4 (Court held that defendant could not be held liable for a breach of fiduciary duty claim since the argument that defendant's departure from company was the proximate cause of future lawsuits was too speculative).

The Release cannot be construed as the proximate cause of any damage to BPC.  Its existence did not prevent parties from suing Roy Brown and in fact the original adversary proceeding included claims against Roy Brown in relation to both the Loan and the Release. Any possible injury to BPC, such as the removal of what would otherwise be a large account receivable on its books, is too dubious and far-removed to be considered either certain or foreseeable. Ohio case law is clear that any damages arising from the breach of fiduciary duty must be probable or likely, not simply possible. *See Morgan*, 2012 WL 626209 at *4.  Also while the adversary proceeding only sought monetary damages from Roy the Plaintiff could have instead chosen to pursue Roy's ownership interest in B's Nest.  In fact since Roy Brown is still a partner in B's Nest the Plaintiff could still execute on any judgment by seeking to liquidate Roy Brown's ownership interest in B's Nest.  Since the Release did not cause any proximate damage to BPC, summary judgment is granted and counts 4 against Roy Brown and counts 4 and 5 against Clancy Brown are dismissed.


II.    <u>BRINNON COUNTS AGAINST SODALIS, B'S NEST, ROY BROWN, AND</u>
       <u>CLANCY BROWN; AND HAINES COUNTS AGAINST DOROTHY HAINES</u>
       <u>AND RICHARD HAINES</u>

All of the Brinnon and Haines Counts are brought under sections 550(a) and 544(b) of the Bankruptcy Code.  Section 544(b) of the Bankruptcy Code provides that the "trustee may

avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim…"  11 U.S.C. § 544(b)(1).  The applicable state law in this case is the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code 1336.04.[12]  The fraudulent transfer claims alleged in the Brinnon and Haines Counts are only being brought pursuant to Ohio law.

Section 550(a) reads:

a.  Except as otherwise provided in this section to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(b) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from –
    1.  The initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    2.  Any immediate or mediate transferee of such initial transferee

11 U.S.C. § 550(a)

A. *Brown Defendants as Transferees or Beneficiaries*

Under 11 U.S.C. § 550(a)(1) the trustee can only recover property, or its value, that was fraudulently transferred from either the initial transferee of such a transfer or the entity for whose benefit such transfer was made.  Courts have explained that the term "benefit" in section 550(a)(1) must be "'direct ascertainable and quantifiable' and must correspond to, or be commensurate with, the value of the property that was transferred."  *Enron Creditors Recovery Corp. v. J.P. Morgan Secs., Inc.* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 32-33 (Bankr.S.D.N.Y. 2009) *rev'd on other grounds*, 422 B.R. 423 (S.D.N.Y. 2009) (citing *Reily v. Kapila* (*In re Int'l. Mgmt. Assoc*) 399 F.3d 1288, 1293 (11th Cir. 2005)).  "It is not sufficient if the benefit is incidental, unquantifiable, or remote." *Id*.  However a benefit can occur "without the beneficiary ever holding the money or property…." *Sec. Investor Prot. Corp. v. Stratton*

---

[12]    There is no dispute among the parties that Ohio law governs here.

*Oakmont, Inc.*, 234 B.R. 293, 313 (Bankr.S.D.N.Y. 1999).  A '"paradigm' transfer beneficiary [is] a party whose indemnification obligations or whose own debts are extinguished or reduced by the transfer." *In re McCook Metals, L.L.C.*, 319 B.R. 570, 590 (Bankr.N.D. Ill. 2005).

Neither Roy Brown, Clancy Brown, nor B's Nest can be considered beneficiaries of the transfers that BPC made to Cate Brinnon under the Brinnon Stock Agreement for the purposes of section 550(a)(1).  Under the Novation Agreement, Sodalis explicitly assumed all of BPC's former obligations to Cate Brinnon.  Novation Agreement, §§ A(6), B(4). The Brown Defendants correctly conceded at oral argument that Sodalis itself benefited from the Brinnon Transfers because each transfer had the effect of reducing Sodalis' obligation to Cate Brinnon.  Summary Judgment Hearing, Tr. 63:25-64:3, October 23, 2014.  However, B's Nest received no similar benefit from BPC's transfers.  Although B's Nest is a guarantor under both the Brinnon Stock Agreement and the Novation Agreement, B's Nest is a *non-recourse guarantor*.  Due to B's Nest's role as a non-recourse guarantor any obligation that B's Nest had would be unenforceable.  Therefore neither B's Nest nor its partners could be held liable if Sodalis did not satisfy its obligations to Cate Brinnon.  Since B's Nest guarantee is in effect illusory any transfers BPC made to satisfy this obligation provided no benefit to B's Nest.  Thus summary judgment is granted in favor of B's Nest with respect to the Brinnon Counts and those claims are dismissed.

Likewise, Roy Brown and Clancy Brown cannot be considered beneficiaries of the Brinnon Transfers under section 550(a)(1).  They could not have been personally targeted by any litigation commenced by Cate Brinnon because Roy and Clancy had no obligations under the

Novation Agreement.  The only party legally obligated under the Novation Agreement was

Sodalis.  If there was a threat of litigation[13] it could have only been against Sodalis.

This view comports with Judge Eisenberg's earlier decision in Brown I wherein she held

that "[a]ny litigation could only have been brought against Sodalis…." *Brown Publ'g Co.*

*Liquidating Trust v. Roy E. Brown* (*In re Brown Publishing Company)*, No-73295, 2014 WL

1101855, at *5 (Bankr.E.D.N.Y. March 20, 2014).  While Judge Eisenberg explained that Roy

Brown could have been concerned about the effect of a lawsuit against Sodalis due to its effect

on Roy's "enterprise structure," those were only concerns that Roy had as the CEO of BPC, not

as an individual.  In contrast the Plaintiff alleges that Roy was afraid that he would be held

*personally* liable.  There is no evidence that Cate Brinnon intended, desired, or even could sue

Roy and Clancy Brown individually for what was solely an obligation of Sodalis.

Although the Plaintiff had originally argued in its response papers that it could pierce the

corporate veil of Sodalis in order to hold Roy and Clancy liable at a recent hearing Plaintiff

admitted that it no longer believed it could succeed on a veil piercing theory, and is not pursuing

Roy and Clancy on that basis.  Court Hearing Tr. 29:6-29:9 February 4, 2015.  In so far as

Plaintiff claims that Roy and Clancy benefited as *members* of Sodalis since the transfers deterred

litigation against Sodalis, the Court finds the argument unpersuasive.

Such an argument ignores the fundamental concept that a corporation exists as a separate

legal entity, and its owners are not liable for the debts of the corporation.  *See Anderson v.*

*Abbott,* 321 U.S. 349, 361–63, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *Morris v. State Dep't of*

*Taxation & Fin.,* 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993).  Ohio

recognizes this general rule and in addition specifically classifies LLCs as separate legal entities

---

[13]    The Liquidating Trust points to emails between Cate Brinnon's counsel and BPC's general counsel Joel Dempsey from December 6, 2007 to demonstrate that there was a threat of litigation.  (ECF No. 214, Exhibit 25).

whose members are not personally liable for any obligation or liability of the LLC.  *See*

*Disciplinary Counsel v. Kafele,* 108 Ohio St. 3d 283, 2006-Ohio-904, 843 N.E.2d 169 at ¶18

(Ohio 2006)(citing R.C. 1705.01(D)(2)(e))("a limited-liability company exists as a separate legal

entity");  *In re ICLNDS Notes Acquisition, LLC*, 259 B.R. 289, 292 (Bankr. N.D. Ohio

2001)(citing R.C. 1705.48(B))("The members and managers are not personally liable for the

LLC's debts solely by reason of being members or managers").  This limited liability is a "basic

tenant of American corporate law" that is not lightly set aside.  *Dole Food Co. v. Patrickson*,

538 U.S. 468, 474-75, 123 S. Ct. 1655, 1660, 155 L. Ed. 2d 643 (2003).

       The majority of cases addressing this issue have held that a shareholder in a corporation

which receives the benefit of a fraudulent transfer is not personally liable under section

550(a)(1).  *See Dietz v. Spangenberg*, No. CIV. 11-2600 ADM/JJG, 2013 WL 4610530, at *18

(D. Minn. Aug. 29, 2013) (Defendant shareholder did not benefit from assets that his company

received); *Sher v. SAF Fin., Inc.,* No. CIV.A. RDB 10-1895, 2011 WL 4835700, at *3 (D. Md.

Oct. 11, 2011) (The shareholder of a corporation did not receive a benefit under 550(a)(1) when

the assets of that corporation increased);  *Schechter v. 5841 Building Corp.* (*In re Hansen),* 341

B.R. 638, 645 (Bankr. N.D. Ill. 2006) (Defendant did not benefit under 550(a)(1) for payments

made to a corporation he controlled as president and majority shareholder).  Although a few

cases indicate that a controlling party of an LLC could receive a benefit from an action that

benefits the LLC as a whole, such cases are a distinct minority, and this Court declines to follow

their analysis.  *See In re Felt Mfg. Co., Inc.,* 371 B.R. 589, 643 (Bankr. D.N.H. 2007) ("[I]t is

possible that a transfer of property to an LLC may benefit an owner…").

       This Court agrees with the reasoning employed by the majority of cases addressing this

issue and reject a broad view of section 550(a)(1) that would effectively eliminate the purpose

and protection of the corporate form.  There is nothing in section 550(a)(1) which indicates "that [the] corporate form can be thrust aside" and that members of an LLC or shareholders in a corporation are liable "on the mere assumption that shareholders somehow automatically 'benefit' from such transfers."  *In re Hansen,* 341 B.R. at 645.  While the Court notes that most of the cited cases deal with corporations rather than LLCs there is no practical difference as an LLC under Ohio law also has a separate identity and provides its members with the same protections.

For the reasons explained above it is clear that under any applicable definition, Roy Brown, Clancy Brown, and B's Nest did not "benefit" from the Brinnon Transfers.  Thus the Court grants summary judgment with respect to Roy Brown, Clancy Brown, and B's Nest as to the Brinnon Counts and those claims are dismissed.[14]  However since Sodalis did receive a benefit through the reduction of its debt to Cate Brinnon, the motion for summary judgment with regard to it is denied.

B.  *Constructive Fraudulent Transfer Claims Against the Brown and Haines Defendants*[15]

i.  *Provisions of Constructive Fraud under Ohio Law*

Under the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code § 1336.04:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
(1) With actual intent to hinder, delay, or defraud any creditor or the debtor; *or*

---

[14]    Similarly any argument by Plaintiff for a claim under quantum meruit also fails because neither Roy Brown, Clancy Brown, or B's Nest received a benefit from the transfers. *Meyer v. Chieffo*, 193 Ohio App.3d 51, 2011-Ohio-1670, 950 N.E.2d 1027, at ¶ 37 (Ohio Ct. App. 2011)(The elements of a quantum meruit claim are (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment).
[15]    All of the intentional fraud claims under section 1336(A)(1) were dismissed as to the Haines Defendants.  To the extent that the Brown Defendants challenge the intentional fraudulent claims, the Court finds that whether there is intent is a question of fact and cannot be resolved on summary judgment.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, **and** if *either* of the following applies.

> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
> (b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Ohio Rev. Code § 1336.04 (emphasis added)

In addition, Ohio Revised Code § 1336.05(A) states:

> A. A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer *or* obligation and the debtor was insolvent at that time *or* the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev. Code § 1336.05(A) (emphasis added)

Thus, to prevail on its constructive fraud claims, the Plaintiff must establish by a preponderance of the evidence that BPC received less than reasonably equivalent value in exchange for the challenged transfers *and* also must demonstrate at least one of the following: (1) that BPC was insolvent on the date the transfers were made or became insolvent as a result of the transfers; (2) that BPC was engaged in business or a transaction for which its property remaining after the transfers was an unreasonably small capital; or (3) that BPC intended to incur, or believed that it would incur, debts beyond its ability to repay. *See* Ohio Rev. Code §§ 1336.04(A)(2) and 1336.05(A). The Court will first address the question of whether the transfers challenged by the Plaintiff were supported by an exchange of reasonably equivalent value and then turn to an examination of BPC's financial condition at the time of and directly following the transfers in question.

ii.      *Reasonably Equivalent Value*[16]

Under Ohio law "to determine whether a debtor receives reasonably equivalent value, the court must compare the value received to the value given up by the debtor." *Patricia Gerdes v. Center Motoric, Inc.*, (*In re Gerdes*), 246 B.R. 311, 313 (Bankr. S.D. Ohio 2000). This "value must be measured from the standpoint of the debtor." *Canyon Systems Corporation v. Dennis Hayslip* (*In re Canyon Sys. Corp.*), 343 B.R. 615, 639 (Bankr. S.D. Ohio 2006). "The date for determining reasonably equivalence is the date of the transfer." *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson),* 196 F. App'x 337, 342 (6th Cir.2006). But "[w]hether a transfer is for reasonably equivalent value is a question of fact to be determined from all the evidence in a particular case." *Gabor v. Silagy*, (*In re Gabor*), 280 B.R. 149, 162 (Bankr. N.D. Ohio 2002).

Before addressing the Haines Transfers it is important to note that Judge Eisenberg in Brown I analyzed the Brinnon Transfers and held that there were questions of material fact about whether those transfers were for reasonably equivalent value and denied summary judgment on those issues. Judge Eisenberg ruled that "there is no evidence that the value of the BPC Shares redeemed by the Debtor and the Defendant's withdrawal from B's Nest were reasonably equivalent to the $9,380,647.40" and that "[t]here was no appraisal conducted regarding the value of the BPC shares redeemed." *In re Brown Publishing Company*, 2014 WL 1101855 at *6. Specifically Judge Eisenberg found that the metrics relied on by Roy Brown, namely comparing BPC to multiples for other publicly traded companies found in Dirks Van Essen newsletters and an outside accounting firm, were insufficient to determine value since the Defendants did not provide information explaining why the multiples that were used were appropriate. *Id.* Although Brown I only concerned the Brinnon Transfers, Judge Eisenberg's analysis is still

---

[16]      Due to Judge Eisenberg's Decision in Brown I the Brown Defendants do not challenge whether or not there was reasonably equivalent value with respect to the Brinnon Transfers and therefore this section of the Decision only concerns the Haines Defendants.

relevant because the Haines Transfers occurred over the same time period and the parties raise similar arguments.

The Haines Defendants argue that as a threshold matter, since the Plaintiff does not seek to set aside the different stock agreements that were the basis for the Haines Transfers as illegal or unenforceable, the Plaintiff is acknowledging that the contracts are legal and enforceable. Therefore any exchange must have been for reasonably equivalent value.  However, the Haines Defendants do not cite any case law in support of this proposition and their argument fails to take into account the specific language of Ohio Rev. Code § 1336.04.  Section 1336.04 does not require a finding that the underlying agreement is illegal or unenforceable.  Instead the statute looks to whether the "transfer made" or the "obligation incurred" gave rise to a cause of action affecting a "*creditor*."  This Court "interprets all federal and state statutes according to their plain meaning."  *In re Asher*, 488 B.R. 58, 64 (Bankr. E.D.N.Y. 2013) (citing *Tyler v. Douglas*, 280 F.3d 116, 123 (2d Cir. 2001), *cert denied*, 536 U.S. 906, 122 S.Ct 2361, 153 L.Ed2d 182 (2002)). The plain meaning of Ohio Rev. Code § 1336.04 is clear, there is no requirement that the underlying contract or agreement be deemed invalid - just that an aspect or payment resulting from that contract be subject to recovery by a creditor.  Any other reading of the statute would add an additional step and change its purpose, which is to protect *creditors* from contracts or deals that transfer assets of a debtor to the creditor's detriment.  It is enough for the Plaintiff to allege that the transfers were not for reasonably equivalent value and that the remaining assets were unreasonably small or that the debtor could not pay debts as they became due.[17]

Indeed whether the Haines Transfers were for reasonably equivalent value is a question of fact.  The Haines Defendants point to the Dirks Report to indicate that Roy Brown considered

---

[17]    Although this argument is not raised by the Brown Defendants, the same reasoning would apply to the Brinnon Transfers as well.

valuation reports and took the appropriate discounts before coming to a fair price for the stock.[18]

However the issues raised by the Plaintiff about the Dirks Report cannot be resolved on

summary judgment.  These include whether the Dirks Report presents an inappropriate

"synergistic value" that is higher than fair market value and its timing, since it was

commissioned over a year before the first of the Haines Transfers.  In addition there are

discrepancies between Richard Haines' and Roy Brown's Declarations in support of summary

judgment and earlier deposition testimony about when exactly the Haines Defendants agreed to

sell their stock back to BPC and the method for valuing those shares.  Specifically there are

discrepancies concerning whether the Haines Defendants agreed to sell their stock in 2006 for

$1,700 a share (Richard Haines Decl. ¶ 6 May 30, 2014 ECF  No. 195) or if there was an offer

made by BPC in 2002 to buy the shares for $1,300 or $1,350 a share immediately and $1,850 if

they waited five years (Richard Haines Dep. Tr. 27:19-28:6 December 5, 2013 ECF No. 214

Exhibit 35).  There are also discrepancies concerning whether Roy Brown valued the shares by

discussing the Dirks Report with BPC's Board of Directors (Roy Brown Dep. Tr. 146:4-147:7

December 9, 2013 ECF No. 214 Exhibit 3) or if he engaged in a more exhaustive process of

applying specific discounts  (Roy Brown Decl. ¶¶ 10-17).

It is not fatal to the Plaintiff's position, as the Haines Defendants allege, that the Plaintiff

did not provide its own valuation report of the shares. There are other methods by which the

Plaintiff can demonstrate that the Haines Transfers were not for reasonably equivalent value.  If

for example BPC was insolvent at the time of the transfers, as Plaintiff alleges, then any of the

transfers BPC made to buy back its own stock would inherently not have been for reasonably

---

[18]    The Court does not need to reach the issue of whether the Dirks Report should be considered
unauthenticated and inadmissible heresy for the purposes of this summary judgment motion because even
with the report there are sufficient questions of fact with regard to whether BPC paid reasonably
equivalent value for the Haines Defendants BPC shares.  While this section of the Court's decision will
assume the admissibility of the Dirks Report, a final decision on admissibility is reserved for trial.

equivalent value. *See Joshua Slocum, LTD. v. Boyle* (*In re Joshua Slocum, LTD*), 103 B.R. 610,

618 (Bankr. E.D. PA 1989) ("The courts have uniformly concluded that a stock redemption by

an insolvent company fails to supply reasonably equivalent value to the company"); *see also In*

*re Roco Corp.,* 701 F.2d 978, 982 (1st Cir.1983).  Questions about the Dirks Report and the steps

taken by Roy Brown raise inherently factual questions about whether the shares were exchanged

for reasonably equivalent value that cannot be resolved by summary judgment.  This is in line

with Judge Eisenberg's reasoning in Brown I wherein she detailed factual issues in dispute

regarding the Dirks Report such as whether the methodology employed was reasonable or

appropriate.

> iii.    *Financial Condition of Debtors At Time of Transfers*[19]

Judge Eisenberg also addressed BPC's financial condition in Brown I and discussed

whether BPC could be considered insolvent at the time of the Brinnon transfers.[20]  This

discussion included an analysis of whether BPC could pay its debts as they become due and if

BPC had sufficient capital.  Judge Eisenberg reviewed the affidavit of Plaintiff's expert Mark S.

Warshavsky ("Warshavsky"), the partner in charge of the Business Valuation and Litigation

Group at Gettry Marcus, sworn to on January 8, 2014 (the "Warshavsky Affidavit") concluding

that the Debtors were balance sheet insolvent.  *In re Brown Publishing Company*, 2014 WL

1101855 at *8.  As part of that analysis, Warshavsky focused on the three largest Brinnon

Transfers in 2006 and 2008, and determined based on a balance sheet analysis that during those

times periods, BPC's liabilities exceeded its assets indicating that BPC was insolvent at those

points.  *Id*. at *9  However, Judge Eisenberg held that the method used by Warshavsky,

---

[19]    Since the Haines Transfers and Brinnon Transfers occurred during the same time period this discussion applies equally to all Defendants.

[20]    In order to determine the value of BPC, both parties' respective experts combined the operations of BPC, BMH, and their subsidiaries.

determining the book value of BPC's assets and liabilities, while applicable in some circumstances for determining insolvency is not proper under Ohio law. *Id.* Under Ohio law a fair value test is required. *Id.* Therefore, Judge Eisenberg did not have sufficient information to determine if the fair value of the Debtors' liabilities exceeded the fair value of their assets. *Id.*

Warshavsky also concluded that BPC did not have sufficient capital and were not able to pay their debts as they became due after an analysis of BPC's working capital, financial solvency/liquidity, and coverage/leverage indicated that BPC's ratios were inferior to its peers from 2006 to 2009. *Id.* Although Judge Eisenberg did not question the accuracy of this report, she did find that without more information regarding the aforementioned peers the Court could not conclude that a negative comparison between BPC and those peers indicated that BPC faced financial problems. *Id.* In addition while there were periods of time when BPC did have difficulty making payments to Carte Brinnon, the Court found that there was insufficient information to determine whether those periods were temporary as well as whether systemic problems existed since BPC did eventually pay their debts and subsequently obtained significant financing. *Id.* at *10. While Judge Eisenberg acknowledged the infirmities in the Warshavsky Affidavit she denied summary judgment, finding that it was still possible that the Plaintiff could prove its case at trial. *Id.*

a. *Insolvency*

Under the Ohio Uniform Fraudulent Transfer Act there are two methods of proving insolvency: (1) "A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation." Ohio Rev. Code Ann. § 1336.02(A)(1); (2) "A debtor who generally is not paying his debts as they become due is presumed to be insolvent." Ohio Rev. Code Ann. § 1336.02(A)(2). Generally insolvency is a "factual determination." *Foreman*

*Indus., Inc. v. Broadway Sand & Gravel (In Matter of Foreman Indus., Inc.),* 59 B.R. 145, 149

(Bankr.S.D.Ohio 1986) (citing *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir. 1985)).  The burden

is on the plaintiff to prove insolvency by a preponderance of the evidence.  *In re Canyon Systems*

*Corp.* 343 B.R. at 647.

### 1.   Expert Reports

The Court will first address whether the affidavits and reports submitted by Warshavsky

are properly admitted for consideration.  The Haines Defendants question Warshavsky's role as

an expert under Fed. R. Evid. 702 but outside of citing *Daubert v. Merrell Dow Pharmacuticals*,

509 U.S. 579, 592 n.10 (1993) they provide no analysis or rationale to exclude either

Warshavsky as an expert or his report.  In addition none of the parties addressed or raised this

issue at oral arguments on October 23, 2014.  Generally,

> "[i]n the context of a bench trial where there is not a concern for juror confusion or
> potential prejudice, the court has considerable discretion in admitting the proffered
> testimony at the trial and then deciding after the evidence is presented whether it deserves
> to be credited by meeting the requirements of *Daubert* and its progeny."

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 fn.1 (S.D.N.Y. 2007)

At this time the Court accepts the affidavits and reports of Warshavsky for the limited purpose of

ruling on this summary judgment motion.  This action does not prejudice any parties since the

Warshavsky affidavits are not dispositive of any issue at this stage.  However, the Court reserves

the right to rule on the admissibility of any and all reports at trial after a full *Daubert* hearing.

Next, the Court will address the Haines Defendants contention that the Second

Warshavsky Affidavit is a new opinion that was created after discovery closed and thus should

be excluded from the record.[21]  Expert discovery was controlled by a joint stipulation entered

into by both parties which fixed a deadline of January 31, 2014 for designating experts and

---

[21]     At the Hearing on October 23, 2014 the Court requested additional papers on this narrow issue.
This issue was only raised by the Haines Defendants but the analysis applies to both proceedings.

serving disclosure.  Although the Plaintiff identified Warshavsky as its expert, before the deadline, the report was not filed until February 3, 2014 after an expedited hearing before Judge Eisenberg.  Warshavsky was examined on April 23, 2014 and after the Plaintiff received the Defendants' expert report, the Second Warshavsky Affidavit was filed.  The Second Warshavsky Affidavit is critical of the Risius Report and includes substituted financial figures that Warshavsky believed were more accurate and which demonstrate that BPC was insolvent during the relevant time period.

Under Fed.R.Civ.P. 26(a)(2)(B)(i), applicable through Rule 7026 of the Federal Rules of Bankruptcy, parties must serve expert disclosures containing "a complete statement of all opinions to be expressed and the basis and reasons therefore ....."  Failure to comply with Fed.R.Civ.P. 26(a) means that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed R. Civ. P. 37(c)(1).[22]  Courts have rejected supplemental expert evidence after the close of discovery, where such evidence concerned "a new and complex approach designed to fill a significant and logical gap in the first report."  *United States v. City of New York,* 637 F. Supp. 2d 77, 107 (E.D.N.Y. 2009) (quoting *Point Productions A.G.,* No.93Civ.4001, 2004 WL 345551, at *9 (S.D.N.Y. February 23, 2004)).  "However, to the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery."  *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011).  The Court is also mindful of the fact that preclusion is a particularly severe sanction and that

---

[22]    Fed R. Civ. P. 37(c)(1) is applicable through Rule 7037 of the Federal Rules of Bankruptcy.

courts must consider "less drastic responses." *Id*. at 278 (quoting *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988)).

The Second Warshavsky Affidavit cannot be considered a "new and complex approach" that compels preclusion since it merely reaffirms the earlier affidavit and is consistent with Warshavsky's deposition testimony, wherein he stated that if certain changes were made to the Risius model then BPC would appear insolvent.  Warshavsky Depo Tr. 208:6-9, ECF No. 213 Exhibit 9.  When courts have precluded subsequent affidavits to original reports they have done so when the new affidavit has offered an entirely new opinion.  *See Buxton v. Lil' Drug Store Products, Inc.*, No. 2:02CV178KS-MTP, 2007 WL 2254492, at *7 (S.D. Miss. Aug. 1, 2007) *aff'd*, 294 F. App'x 92 (5th Cir. 2008) (Court precluded the supplemental affidavit because it included "entirely new opinions" about alternative causes of the plaintiffs brain cancer which did not appear in any prior affidavits).  In any event, to the extent the Second Warshavsky Affidavit contains new information any such information is harmless and cannot justify the severe sanction of preclusion, in part because Warshavsky had been previously examined and expressed his disagreement with the Risius Report at that time.  *See Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 61 (S.D.N.Y. 2003) (Court refused to preclude an affidavit that went "well beyond his Rule 26 report" because there was no harm to any party).  For the above reasons the Court will not preclude the Second Warshavsky Affidavit from consideration.

### 2.    *Insolvency Analysis*

There are two methods under Ohio law for proving insolvency.  The first method is to demonstrate that the sum of the debts of the debtor are greater than all of the assets of the debtor using fair valuation.  Ohio Rev. Code Ann. § 1336.02(A)(1).

In Brown I, Judge Eisenberg pointed out that the Plaintiff failed to use a fair value test to analyze BPC's balance sheet and instead used the book value.  However this was not deemed fatal to the plaintiff's claim:

> "[T]he absence of such information did not necessarily mean that the Debtor was solvent and able to pay all its debts as they became due or that the Plaintiff would not be able to prove at trial insolvency and other issues of material fact raised by the Court if given additional time to conduct the appropriate valuation."

*In re Brown*, 2014 WL 1101855 at *9.

Insolvency is inherently a factual question that is generally not able to be resolved on summary judgment.  As Judge Eisenberg identified in Brown I, there could be other factors or testimony that the Plaintiff elicits at trial which demonstrates to a trier of fact that BPC was insolvent.  Therefore, while book value is not the appropriate valuation for determining insolvency under Ohio law it is not appropriate to dismiss this portion of the Plaintiff's claim at the summary judgment stage.

Under the second method a presumption of insolvency is established when a debtor is not paying his debts as they become due.  Ohio Rev. Code Ann. § 1336.02(A)(2).  Here the competing arguments set forth in the underlying expert reports, along with the criticism each party has lodged against each other's report preclude summary judgment.  Defendants dispute Warshavsky's comparison of total liabilities to total assets, long term debt to total assets, and times interest earned by the Debtor with similar companies within the same industry from 2006 to 2009 because it is unclear who those similar companies are and their relative financial states.  Judge Eisenberg highlighted the same issue in Brown I, namely that "[u]nless evidence is given to demonstrate that the Debtor's peers had relatively small capital and were unable to pay their debts as they come due the Court cannot conclude that the Debtor had the same financial difficulty based upon these ratios."  *In re Brown*, 2014 WL 1101855 at *9.  In addition,

Defendants and the Plaintiff disagree over whether an email string between Roy Brown and Cate Brinnon from July 3, 2008 to July 7, 2007 demonstrates that the Debtors were not paying their debts as they became due.[23]  Both of these methods to prove insolvency raise factual questions that are not suited for summary judgment and must be resolved at trial.

### b.    Unreasonably Small Capital

Another method of proving constructive fraud under Ohio law is to demonstrate that "[t]he debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."  Ohio Rev. Code 1336.04(A)(2)(a).  "The phrase 'unreasonably small capital' is not defined in the Bankruptcy Code or the UFTA.  Its meaning must, therefore, be ascertained upon a case-by-case review of the capital structure of a debtor's business."  *In re Canyon Sys. Corp.*, 343 B.R.at 650 (*quoting Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 998 (Bankr. S.D.Ohio 1990)) (internal quotation marks omitted).

The Court finds that the Defendants have raised viable questions of fact about the content of the Warshavsky Affidavit on this point, due to its focus on peer companies without explaining who those peer companies are or their financial condition. This comports with Judge Eisenberg's earlier ruling in which she found that "conflicting information" about the Debtors' capital and the financial status of the Debtors peers warranted denial of summary judgment.  The Defendants also point to the Risius Report as evidence that BPC was in good financial health at the time of the transfers.  The differing opinions embodied by the Warshavsky Affidavit and the Risius Report represent a quintessential "battle of the experts" which precludes a decision on summary judgment.

---

[23]    Specifically comments from Roy Brown that Cate Brinnon's payment date "coincided with a payroll and large principal/interest payment to banks that left [BPC] with no cash at the beginning of the month…."  Warshavsky Affidavit, at 16 January 8 2014, ECF No. 154 Exhibit 28.

      c.   *Debtor Intended, Believed, or Reasonably Should Have Believed That It Was*

              *Incurring Debts Beyond The Debtor's Ability To Pay As They Became Due*

Constructive fraud can also be demonstrated if "[t]he debtor intended to incur, or

believed or reasonably should have believed that the debtor would incur, debts beyond the

debtor's ability to pay as they became due."  Ohio Rev. Code 1336.04(A)(2)(b).  This prong

requires a determination of subjective intent, namely what the Debtor intended or believed, and

therefore is not appropriate for a motion for summary judgment.  *See Citizens Bank of*

*Clearwater v. Hunt,* 927 F.2d 707, 711 (2d Cir.1991) (Court determined that issues of intent and

credibility were "inappropriate" for summary judgment and should be resolved after a trial).

Summary judgment is not appropriate at this stage for the Haines Counts and the

remaining Brinnon Counts since there are material questions of fact about whether or not BPC

received reasonably equivalent value for the transfers, was insolvent at the time of the transfers,

possessed unreasonably small capital, or whether BPC knew or reasonably should have known it

was incurring debts beyond its ability to pay.

    III.    <u>RENTAL COUNTS AGAINST ROY BROWN, CLANCY BROWN, AND CRJ</u>

Under Ohio Rev. Code § 1336.05(B)

"A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor
whose claim arose before the transfer was made or the obligation was incurred if the
transfer was made to or the obligation was incurred with respect to an insider for an
antecedent debt, the debtor was insolvent at that time, and the insider had reasonable
cause to believe that the debtor was insolvent."

Ohio Rev. Code § 1335.05(B)

However a transfer is not considered fraudulent under§ 1335.05(B):

(1) To the extent the insider gave new value to or for the benefit of the debtor after the
transfer was made, unless the new value was secured by a valid lien;

 (2) If made in the ordinary course of business or financial affairs of the debtor and the insider;
 (3) If made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

Ohio Rev. Code § 1336.08(E)

The Plaintiff seeks recovery of $405,080.00 that the Debtors paid to CRJ pursuant to the Amended Leases from Oct. 1, 2009 to the Petition Dates.  However section 1336.08(E) applies to any transfers made pursuant to the Amended Leases.  This section specifically provides exceptions to section 13365(B) for transfers that provide new value, are made in the ordinary course of business, or are made pursuant to a good faith effort to rehabilitate the Debtor.  Here the transfers provided new value since the Debtors were able to continue to use and occupy the premises.  Plaintiff admitted at Oral Arguments that the new rent paid by BPC to CRJ was market value, the former rate being heavily discounted.  Summ. J. Hr'g Tr. 86:19-21.  The record also indicates that the Amended Leases were required in order for BPC to continue functioning and to prevent financial loss.  A finding that the Amended Leases represent new value is consistent with applicable case law, in which other courts have held that a party receives value when it continues to use and occupy rental property.  *See S. Technical Coll., Inc. v. Hood*, 89 F.3d 1381, 1384 (8th Cir. 1996) ("Each month, a lessee receives new value from its lessor when it continues to use and occupy the rented property").  Since BPC and BMH admittedly only paid market rates under the Amended Leases and they benefited from the continued use of the property the transfers were for new value, which is an absolute defense to Ohio Rev. Code § 1336.05(B).[24]

---

[24]    In addition, this count must be dismissed because CRJ cannot be considered an insider under Ohio Rev. Code § 1336.01(2)(a)-(f), and Roy and Clancy Brown did not receive any benefit through 550(a)(1) because any benefit to CRJ, an independent LLC, does not pass through to its shareholders or members for purposes of section 550(a)(1).  *See supra* Part II.A.

For these reasons, summary judgment for count 19 is granted in favor of the Defendants and count 19 is dismissed in its entirety.

IV.    LIFE INSURANCE COUNTS AGAINST ROY BROWN, CLANCY BROWN, AND B'S NEST

The Plaintiff alleges that Roy Brown, Clancy Brown, B's Nest, and Cate Brinnon[25] engaged in both intentional and constructive fraud under Ohio Rev. Code 1336.04 and 1336.05, as well as preferential transfers under the Bankruptcy Code, with regard to the $300,000.00 that BPC transferred to AXA.[26]  However courts have held that "true loans" from a company cannot be considered fraudulent transfers.  *See Integrated Agri, Inc., v. Westbay* (*In re Integrated Agri, Inc.*, 313 B.R. 419, 423 (Bankr. C.D. Ill. 2004) ("If the funds advanced to the shareholders were true loans that the shareholders were obligated to repay, then there was no fraudulent transfer"); *Individual Bus. Servs. v. Carmack*, No. 24085, 2011 WL 1457133, at *9 (Ohio. Ct. App. April 25, 2011) (Court held that a proper loan is a transfer for reasonably equivalent value and therefore cannot be considered a fraudulent transfer).  Loans have been deemed fraudulent transfers where the transactions lack the earmarks of a "true loan."  *See SPC Plastics Corp. v. Griffith* (*In re Structure Plastics Corp.*), 193 B.R. 451, 455 (Bankr. S.D. Ohio) *aff'd in part, re'v in part and remanded*, 224 B.R. 27 (B.A.P. 6th Cir. 1998) (Court held that loans whose only purpose was to allow the Debtor to take on additional debt were not proper loans and could not serve as fair consideration).

The Court finds that consistent with the weight of case law, a true loan between parties where the obligation to repay is acknowledged is not a fraudulent conveyance.  Plaintiff presents

---

[25]    These claims have been dismissed with respect to Cate Brinnon.
[26]    As far as this claim requires a finding that BPC was financially impaired at the time of the transfers the Court has already precluded summary judgment with regard to that aspect.

no case law that illustrates otherwise, and the cases that he does cite are all factually distinguishable, where courts found that the transactions lacked the characteristics of a loan. Indeed here the alleged loan to B's Nest provides a full repayment to BPC (or its estate) with an interest rate of 4% when the Policy is cashed in.  Although there are no loan documents memorializing the transaction, the parties acknowledge the existence of the loan and its provisions in open Court.  Summ. J. Hr'g Tr. 95:2-19.  The payments made by BPC to AXA constitute a true loan to B's Nest and cannot be considered a fraudulent conveyance.  In addition, BPC's transfers to AXA cannot be considered a preference under the Bankruptcy Code because they were not done "on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. 547(b)(2).  The premium payments made by BPC were not made on behalf of BPC, as required by statute, but on behalf of the owner of the Policy and the party obligated to pay the premiums, B's Nest.  Thus the Court grants summary judgment with respect to counts 21 through 24 against Roy Brown, Clancy Brown, and B's Nest and dismisses those counts.

**Conclusion**

For all of the forgoing reasons, the Court grants summary judgment for count 4 against Roy Brown and Clancy Brown; count 5 against Clancy Brown; counts 6 through 9 with respect to B's Nest, Roy Brown, and Clancy Brown; count 19 against Roy Brown, Clancy Brown, and CRJ; and counts 21 through 24 against Roy Brown, Clancy Brown, and B's Nest.

The remainder of the motions for summary judgment are denied, a trial is scheduled for May 14, 2015 at 10AM on the remaining claims.

The Court shall enter an order consistent with this Memorandum Decision.


Dated: Central Islip, New York
      March 4, 2015                    _**/s/ Robert E. Grossman**_
                                          Hon. Robert E. Grossman, U.S.B.J.